# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| KATHERINE GAYLORD-WALLISCH and AARON WALLISCH, Individually, and as parents and Next Friends of K.W., a minor,<br><br>    Plaintiffs,<br><br>        v.<br><br>BRANDYWINE CONSTRUCTION & MANAGEMENT, INC.; TINDECO WHARF, LLC,<br><br>    Defendants. | Civil Action No. 18-cv-03869-DKC |

## JOINT PRETRIAL ORDER

Plaintiffs, Katherine Gaylord-Wallisch and Aaron Wallisch, individually and as parents and Next Friends of K.W., a minor, by and through their attorneys, Seth L. Cardeli, Levin & Perconti, Andrew S. Janet, and Janet, Janet & Suggs, LLC, and Defendants, Brandywine Construction & Management, Inc. and Tindeco Wharf, LLC, by and through their attorneys, Mary Malloy Dimaio and Crosswhite, Limbrick & Sinclair, LLP, and, in conformity with Local Rule 106, hereby submit the following Joint Pretrial Order.

## I.    STATEMENTS OF FACTS & LEGAL THEORIES

### A.  **Plaintiffs' Statement of Facts & Legal Theories**

In August 2017, Plaintiffs, Katherine Gaylord-Wallisch, Aaron Wallisch, and their son, K.W., moved to Baltimore from England. They moved into a rental building at 2809 Boston Street, Baltimore, Maryland 21224 (hereafter referred to as "Tindeco Wharf"), in a building owned, managed, and maintained by Defendants, Brandywine Construction & Management, Inc. and Tindeco Wharf, LLC. Despite having owned and exercised exclusive management of the

1

property since the 1990s, Defendants allowed a dangerous condition to exist on the premises without repair or any notice to residents. Specifically, there was a nine-inch gap on a section of the stairway railing adjacent to the lobby. This wide gap was more than twice the size permitted by the applicable building and management codes: four inches. This gap was large enough for a young child to fit through yet was not visible from the lower level. Defendants have conceded liability on the issue of the oversized gap.

On August 25, 2017, as the Wallisch family was moving into Tindeco Wharf, Ms. Gaylord-Wallisch was teaching her then-17-months-old son to go up and down the stairs. Standing two steps below her son at the top of the staircase, Ms. Gaylord-Wallisch was unable to see the nine-inch gap on the landing at the top of the staircase until K.W. kept walking and went through the railing. Ms. Gaylord-Wallisch immediately ran to the top and straddled the railing to try to stop him, but was unable to get to him before he fell to the floor below approximately 8 ½ feet. K.W. lost consciousness immediately and drifted in and out of consciousness for the following 36 hours. He was brought to Johns Hopkins Hospital by ambulance, where he was diagnosed with a skull fracture with scalp hematoma, a subdural hemorrhage, and a subarachnoid hemorrhage.

On May 30, 2019, K.W. underwent a neuropsychological exam at Kennedy Krieger Institute that also found that the sequelae of his traumatic brain injury included ADHD, hypotonia, and difficulties with visual spatial processing and motor planning, among others.

K.W. is now six years old. Since the traumatic brain injury ("TBI") sustained by K.W., K.W has indeed had problems associated with expressive and receptive language delays, motor delays, visual inattention, decreased accommodation, and hypotonia. Neurologist Dr. William Weiss has examined K.W. and opined that K.W.'s diffuse traumatic axonal injury led to a

permanent neurocognitive disability, which has created difficulties with concentration and language that are likely to be lifelong. Dr. Weiss also opined that K.W.'s diffuse traumatic brain injury was significant not only in the extent of injury on MRI, but also as evidenced by K.W.'s initial loss of consciousness and his subsequent waxing and waning of consciousness. This injury places K.W. at a much greater risk of developing dementia and cognitive decline at a younger age.

Defendants' experts have agreed that K.W. is already showing signs that his TBI will cause lifelong impairments. Defendants' own pediatric neurology expert, Stephen Nelson, M.D., confirmed that K.W. suffered a moderate TBI as a result of Defendant's negligence. The testing performed by Defendant's psychology expert, Lisa Settles, Psy.D., confirmed severe cognitive deficits in important areas of language and cognitive functioning.

Dr. Robert Cooper, the only life care planner in this case, concluded that K.W. will have progressive symptoms, as well as physical and cognitive impairments and disabilities, which will require lifelong medical care. He also concluded that these impairments will adversely impact K.W.'s vocational and avocational activities and opportunities, as well as his and his family's general quality of life.

Dr. Ralph Scott, Jr., the only economist in this case, has estimated that the present value of the cumulative costs recommended by Dr. Cooper to fund K.W.'s future care needs is $2,046,675.53. He has also estimated that, if the jury concludes that K.W. would have graduated from college with a Bachelor's Degree and worked until age 67 had he not sustained his injuries but that K.W.'s post-injury earnings will be severely limited because of his long-term cognitive and functional limitations caused by Defendants' negligence, damages from lost earning capacity would either be $2,309,970.18 (if K.W. cannot be gainfully employed) or $854,751.18 (if K.W.

could be employed in a career associated with a high school degree, but would not graduate from college).

K.W.'s fall has affected his life and his family's lives far beyond the economic impact. As a toddler, K.W. endured the horrifically traumatic experience of plummeting onto a hard floor, fracturing his skull, and slipping in and out of consciousness. He could have died, and his family was terrified that he would. After he regained consciousness, K.W. cried throughout his difficult hospital stay. But the pain and suffering did not end there. The brain injury has created long-lasting problems for K.W.: he has trouble with executive functioning, difficulty focusing, and intellectual deficits, and he tends to get frustrated easily and give up on tasks quickly. His disability will make his entire life harder, including by making him more likely to develop dementia. This is not the life that K.W.'s parents had planned for him. K.W.'s parents have had to spend far more time taking K.W. to doctors and therapists than they would have otherwise needed to, and the services K.W. will provide to his family unit, in terms of housework (in the short-term) and in terms of taking care of his parents as they age (in the long-term), are much more limited as a result of the fall.

If not for the negligent acts and omissions which Defendants have conceded, K.W. would never have suffered his TBI and never have sustained these damages.

B. **Defendants' Statement of Facts & Legal Theories**

In August 2017, Plaintiffs, Katherine Gaylord-Wallisch, Aaron Wallisch, and their son, K.W., moved to Baltimore from England. They moved into an apartment at Tindeco Wharf, located at 2809 Boston Street, Baltimore, Maryland 21224, a building owned, managed, and maintained by Defendants, Brandywine Construction & Management, Inc. and Tindeco Wharf, LLC.  Despite many inspections over the years by the City of Baltimore and insurance carriers,

they were unaware that there was a feature of the railings leading from the lobby to a courtyard entrance that was not compliant with the applicable building code.  Specifically, there was a nine-inch gap on a section of the railing at the top of the stairway, when it should have been no wider than four inches.  Liability has been conceded by Defendants on the issue of the oversized gap.

On August 25, 2017, as the Wallisch family was moving into Tindeco Wharf, Ms. Gaylord-Wallisch was playing with her then-17-month-old son on the twin stairways in the lobby, walking up and down the stairs.  Standing two steps below her son at the top of the staircase, Ms. Gaylord-Wallisch also did not notice the nine-inch gap on the landing at the top of the staircase until K.W., playfully getting away from her, kept walking right through the railing. Ms. Gaylord-Wallisch ran to the top and straddled the railing to try to stop him, but was unable to get to him before he fell to the floor below approximately 8 ½ feet. K.W. lost consciousness immediately, regained consciousness within several minutes, and drifted in and out of consciousness for the following 36 hours. He was brought to Johns Hopkins Hospital by ambulance, where he was diagnosed with a skull fracture with scalp hematoma, a subdural hemorrhage, and a subarachnoid hemorrhage.

The adult Plaintiffs, understandably, wanted to be released from their lease as Tindeco Wharf was the location of their son's serious injury.  Defendants allowed them to break their lease with no strings attached.  The family moved to Las Vegas, Nevada.

On May 30, 2019, the family returned to Baltimore so that K.W. could seek treatment at Kennedy Krieger Institute because they were finding it difficult to locate appropriate services in Las Vegas.  K.W. underwent a neuropsychological exam that found that the sequelae of his

traumatic brain injury included ADHD, hypotonia, and difficulties with visual spatial processing and motor planning.

K.W. is now six years old. Since his traumatic brain injury ("TBI"), K.W has had problems associated with expressive and receptive language delays at age 2, motor delays, visual inattention, decreased accommodation, and hypotonia.

Defendants' pediatric neurology expert, Stephen Nelson, M.D., confirmed that K.W. suffered a moderate TBI in his fall of August 25, 2017. He is of the opinion that, with continued physical, occupational and speech therapies, there is no evidence to suggest that K.W. will not graduate from high school, obtain gainful employment, live independently, and live a normal life span.  The extent of K.W.'s brain injury is mild.  He had a brief loss of consciousness, was never intubated, never experienced seizures, and his continuing developmental improvement is documented.

As a result of the neuropsychological examination performed by Lisa Settles, Psy.D., Defendants' expert, she concluded that "[K.W] is displaying excellent progress in his development . . .. He does continue to demonstrate some challenges in the areas of attention, impulsivity, and executive function, but this may be due to his age, his family history, or due to his own past medical history. He currently has an IEP for a developmental delay exceptionality that allows for him to receive speech therapy to address his articulation difficulties. [K.W.] may require some accommodations in the classroom due to his ADHD symptoms; however, these should not impair him from being able to achieve his educational goals. Furthermore, [K.W.] will be able to live independently without supervision given that he has intellectual abilities that are generally within the limits of his chronological age expectations."  *Id.*

Contrary to Plaintiffs' contentions, there is no need for a life care plan for K.W., and no need to fund it. He should have ongoing speech, physical, and occupational therapy throughout his childhood, of which there has been very little to date, but more likely than not will not need any interventions beyond that. K.W. has progressed well, and there is no reason to think that he will not continue to do so if he consistently gets the help that has been recommended for him.

## II.   AMENDMENTS TO PLEADINGS

### A. Plaintiffs' Requested Amendments to Pleadings

Plaintiffs request for Defendants' first Affirmative Defense ("Defendants generally deny liability") be struck from their Answer, on the grounds that Defendants do not deny liability.

Plaintiffs request for Defendants' second Affirmative Defense ("Plaintiffs' Complaint fails to state a claim upon which relief may be granted against these Defendants") be struck from their Answer, on the grounds that there is no basis for dismissing Plaintiffs' claims in their entirety.

Plaintiffs request for Defendants' third Affirmative Defense ("Plaintiffs' Complaint is barred by the applicable statute of limitations") be struck from their Answer, on the grounds that there is no evidence or legal precedent to support it.

Plaintiffs request for Defendants' fourth Affirmative Defense ("Plaintiffs' Complaint is barred by contributory negligence") be struck from their Answer, on the grounds that there is no evidence or legal precedent to support it.

Plaintiffs request for Defendants' fifth Affirmative Defense ("Plaintiffs assumed the risk") be struck from their Answer, on the grounds that there is no evidence or legal precedent to support it.

Plaintiffs request for Defendants' seventh Affirmative Defense ("Plaintiffs' Complaint is barred by waiver, estoppel, release, and accord and satisfaction") be struck from their Answer, on the grounds that there is no evidence or legal precedent to support it.

### B. Defendants' Requested Amendments to Pleadings

Defendants dispute that their Answer needs to be amended as Plaintiffs contend because the factfinders will never see the Answer.  They do not request any amendments to the pleadings.

## III.   ISSUES TO BE ABANDONED

Plaintiffs do not seek to abandon any issues in their own complaint.

Liability has been conceded by Defendants.

## IV.   STIPULATIONS OF FACT AND REQUESTED STIPULATIONS OF FACT

### A.   <u>Joint Stipulations of Fact</u>

1.     The parties stipulate that all documents produced during discovery, including all medical records, are authentic. Neither party will be required to call any custodian or witness to authenticate or lay the foundation for the admissibility of any medical record, bill, or invoice, or any exhibit identified by either party, or with respect to any document that was produced by a party in response to a discovery request or obtained by subpoena, with the understanding that all other substantive and procedural objections are preserved.

2.     The parties stipulate that the medical records and bills can be redacted to omit references to social security numbers, personal information, and other matters that are the subject of motions in limine, or as agreed upon by the parties.

3.     The parties stipulate that they will exchange their exhibits electronically upon request and/or make them available for inspection and copying.

4.      On August 25, 2017, the Plaintiffs, Katherine Gaylord-Wallisch, Aaron Wallisch, and K.W. were residents of the State of Maryland, residing therein at 2809 Boston Street, Baltimore, Maryland 21224, a building known as Tindeco Wharf Apartments.

5.      On August 25, 2017, Defendant Brandywine Construction & Management, Inc. (hereafter referred to as "BCMI") and Defendant Tindeco Wharf, LLC (hereafter referred to as "Tindeco"), were the owners and/or property managers of the premises located at 2809 Boston Street, Baltimore, Maryland 21224.

6.      On August 25, 2017, Defendants were responsible for the management and/or maintenance of the premises located at 2809 Boston Street, Baltimore, Maryland 21224.

7.      On August 25, 2017, Plaintiff Katherine Gaylord-Wallisch was with her approximately 17-month-old son, K.W., in the common area of her apartment building at 2809 Boston Street, Baltimore, Maryland 21224.

8.      On August 25, 2017, K.W. climbed through a nine-inch gap between the railing and the glass wall at the top of the lobby stairs.

9.      The nine-inch gap was not compliant with building codes, which required the gap to be four inches or less.

10.     K.W. fell approximately 8 ½ feet onto the marble floor of the lobby below.

11.     K.W. sustained a traumatic brain injury (including a fractured skull and bleed in his brain) as a result of the fall.

12.     K.W. would not have fallen as he did if not for the fact that Defendants negligently maintained the building with a nine-inch gap between the railing and the window.

13.     Subsequent to the fall, K.W. experienced a temporary loss of consciousness. EMTs arrived on the scene and transported K.W. to the emergency room at Johns Hopkins Hospital.

14.     There were no significant complications during Plaintiff Katherine Wallisch's pregnancy, labor, or delivery with K.W.

15.     K.W. suffered a second bump to his head when he fell backward at day care on November 29, 2017, when he was 20 months old.

16.     Katherine Gaylord-Wallisch is a trained and practicing speech/language pathologist.

17.     Aaron Wallisch is a high school graduate who did not have additional formal educational training.

18.     The parties additionally stipulate that the literature which will be referenced in expert testimony, and all demonstratives, will be disclosed to the other side at least 48 hours before the literature or demonstrative is used.

**B.  <u>Plaintiffs' Requested Stipulations of Fact</u>**

Plaintiffs request the following stipulations of fact:

1.     Plaintiffs request that by listing a witness or exhibit, the party listing the exhibit or witness is not waiving objections to that witness or exhibit if offered by the opposing party.

2.     Without stipulating to the appropriateness of the underlying treatment recommendations or analysis of K.W.'s educational opportunities, all calculations (including present value calculations) in Dr. Ralph Scott's pending upcoming report are correct.

**C.  <u>Defendants' Requested Stipulations of Fact</u>**

Defendants request the following stipulations of fact:

1.      Defendants were unaware that the gap in the railing at the top of the lobby staircase was not code-compliant, but are nevertheless responsible for it.

2.      K.W. has a maternal aunt with ADHD/ADD and a family history of dyslexia and OCD. His mother has been diagnosed with PTSD and OCPD, dyscalculia and post-partum depression.

3.      K.W.'s mother reported that K.W. had a slight speech delay before the fall.

## V.    DAMAGES CLAIMED

Plaintiffs seek a monetary judgment against Defendants. As a result of the negligence of the Defendants, Plaintiff K.W. has suffered and will continue to suffer mental anguish and emotional pain and suffering, and Katherine and Aaron Wallisch have suffered resultant loss of services. These claims may be subject to a noneconomic damages cap of $860,000, pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-2A-09. Plaintiffs reserve the right to challenge the constitutionality of that statute, should the noneconomic damages awarded by the jury exceed the cap.

Plaintiffs claim $2,046,675.53 in future medical expenses necessary to treat K.W.'s permanent and severe injuries sustained as a result of Defendants' negligence, as documented in detail in Dr. Cooper and Dr. Scott's expert reports.

Plaintiffs further claim that K.W. has sustained a loss of earning capacity as a result of the injuries that he sustained, as documented in the expert reports of Andrea Bradford and Dr. Ralph Scott. The levels of K.W.'s pre-incident and post-incident educational attainment are factual questions for the jury to decide. If the jury decides that K.W. would have obtained a college degree and worked until age 67 if not for the incident but now will be unemployable, the amount of lost earning capacity will be $2,309,970.18. If the jury decides that K.W. would have obtained a college

11

degree and worked until age 67 if not for the incident but now will only obtain a high school degree, the amount of lost earning capacity will be $854,751.18.

Defendants' position is that Plaintiffs are entitled to recover the expenses for the health care and therapies K.W. received.  There is no evidence that K.W. suffered any mental anguish or emotional pain and suffering, and no evidence of any services he provided or will provide to his parents, the loss of which could be claimed by them.  He is six years old.

The lifelong future medical expenses, forecasted educational attainment, and loss of earning capacity are wildly speculative.  Dr. Nelson opines that almost all of the items in the life care plan are unnecessary, excepting physical, occupational, and speech therapy during K.W.'s childhood, or care unrelated to his TBI.

## VI.   LISTING OF EXHIBITS

The parties stipulate that no custodians of records need to be called to testify to lay a foundation for the admission of the records listed herein.

### A.  **Plaintiffs' List of Exhibits**

The documents and exhibits that the Plaintiffs expect to offer (EO), and those that the Plaintiffs may offer if needed (IFN), are listed below.

| MEDICAL RECORDS | | | |
|---|---|---|---|
| | Achievement Therapy Center | September 2020 | EO |
| | Alicia Young, MSPT | 2018 | EO |
| | Baltimore City Fire Department (Ambulance Report) | August 2017 | EO |
| | Desert Valley Pediatrics | 2018–2021 | EO |
| | Elite Occupational Therapy | 2018 | EO |
| | Growth Therapy NV | 2018–2021 | EO |

| | | | |
|---|---|---|---|
| | Johns Hopkins | 2017 | EO |
| | Kennedy Krieger Institute | 2017–2019 | EO |
| | Portland Hospital | 2016–2019 | EO |
| | Primary Children's Hospital | 2018 | EO |
| | SHM Center | 2020 | EO |
| | The Hearing Hub | 2021 | EO |
| | The Lopez Eye Institute | 2020 | EO |
| | Therapy Blocks | 2019–2020 | EO |
| | TriTherapy LV | 2016–2018 | EO |
| | University of Utah | 2018–2019 | EO |
| | UNLV | 2020 | EO |
| | UNLV Ackerman | 2020 | EO |
| | UNLV Health | 2020 | EO |
| | UNLV Medicine | 2020 | EO |
| **BUSINESS RECORDS RELATED TO INCIDENT** | | | |
| | Incident or Accident Report—Joan Taylor | | EO |
| | Incident Report—Taylor Saunders | | EO |
| | Katherine Wallisch's Notice to Vacate Premises | September 25, 2017 | EO |
| **ADDITIONAL RECORDS** | | | |
| | Adelson Educational Campus | January 2019–October 2020 | EO |
| | Baltimore City Fire Department | 2017 | EO |
| | Clark County School District | 2019 | EO |
| | Lindamood-Bell Evaluation(s) | 2020–2021 | EO |

| | | | |
|---|---|---|---|
| | Nevada School Systems | 2019 | EO |
| **EXPERT REPORTS** | | | |
| | Expert Report of William A. Weiss, M.D., Ph.D. | | EO |
| | Expert Report of Robert L. Cooper, M.D., FAAPMR | | EO |
| | Expert Report of Andrea Bradford M.Ed., CRC | | EO |
| | Expert Report of Ralph D. Scott, Jr., Ph.D. | | EO |
| **CVs** | | | |
| | CV of William A. Weiss, M.D., Ph.D. | | EO |
| | CV of Robert L. Cooper, M.D., FAAPMR | | EO |
| | CV of Andrea Bradford M.Ed., CRC | | EO |
| | CV of Ralph D. Scott, Jr., Ph.D. | | EO |
| **PHOTOGRAPHS/RECORDINGS** | | | |
| | Audio Recording of 911 Call | | EO |
| | Photographs of K.W. at Hospital | | EO |
| | Photographs of Railing Gap Before and After Modification | | EO |
| | Recent Photographs of K.W. and Family | | EO |
| **DEMONSTRATIVE EVIDENCE** | | | |
| | Models, illustrations, and/or animations depicting the incident at issue | | EO |
| | Photographs marked up by Duane Ferguson of the stairs and surrounding area of the incident site | | EO |
| | PowerPoint slides or other visual aids during opening statement, direct and/or cross examination of witnesses, and closing argument | | EO |
| **DISCOVERY RESPONSES** | | | |

| | | |
|---|---|---|
| | Tindeco Wharf LLC Answers to Interrogatories and Request for Production of Documents | IFN |
| | Plaintiff's Reply to Brandywine Construction & Management Interrogatories | IFN |
| | Plaintiff's Reply to Brandywine Construction & Management Request for Production of Documents | IFN |
| **VIDEO DEPOSITIONS** | | |
| | Joan Taylor Deposition, including Exs. 1–3 | EO |
| | Bradley Begelman Deposition, including Exs. 1–6 | EO |
| **DEPOSITIONS & EXHIBITS** | | |
| | Melvin Michael Derda, with all exhibits | IFN |
| **LITERATURE** | | |
| | Owings, Stan. Understanding Earning Capacity Assessment and Earning Capacity Options. American Bar Association, 2009. Print. | IFN |
| | Zasler, Nathan D., Katz, Douglas l., and Zafonte, Ross D. Brain Injury Medicine, 2nd Edition: Principles and Practices, 2013. Print. | IFN |
| | Robinson, Rick. Foundations of Forensic Vocational Rehabilitation, 2014. Print. | IFN |
| | Berens PH.D., CRC, CCM, CLCP, Debra E., and Taylor and Francis Group, LLC, Life Care Planning and Case Management Handbook Third Edition. 2009. Print. | IFN |
| | Commission on Rehabilitation Counselor Certification; https://www.crccertification.com/code-of-ethics-3 | IFN |
| | Dictionary of Occupational Titles, http://www.occupationalinfo.org/07/079361018.html | IFN |
| | Andrews, J. Higson, 2008, https://www.tcd.ie/Careers/downloads/Transferable_Skiills_flyer.pdf | IFN |
| | Tipton, Tracy, Independent Research Report, http://www.cdspacific.com/research_report.pdf | IFN |

| | | |
|---|---|---|
| United States Department of Labor, https://www.dol.gov/odep/topics/accommodations.htm | | IFN |
| Pennsylvania Department of Labor and Industry, https://www.dli.pa.gov/Individuals/Disability-Services/Pages/Disability-Services.aspx | | IFN |
| Bureau of Labor Statistics, http://www.bls.gov/oes/current/oes_tx.htm#13-0000 | | IFN |
| JAN, Job Accommodation Network, A service of the Office of Disability Employment Policy, U.S. Department of Labor, https://askjan.org/topics/discl.htm | | IFN |
| O*Net (Occupational Information Network) Online http://online.onetonline.org | | IFN |
| Job Browser Pro, Version 1.6 6 SkillTRAN, Spokane, WA 2012 | | IFN |
| London Paediatricians, Ltd./The Portland Hospital (Medical) - London, England Elia Maalouf, M.D. | | IFN |
| American Academy of Physician Life Care Planners, A Physician's Guide to Life Care Planning: Tenet, Methods, and Best Practices for Physician Life Care Planners, American Academy of Physician Life Care Planners, Austin, Texas, 2017. | | IFN |
| Gonzales JG, Zotovas A. Life Care Planning: A Natural Domain of Physiatry. PM&R: the Journal of Injury Function and Rehabilitation. 2013; Volume 6, Issue 2, 184 - 187 | | IFN |
| Bonfiglio, R. P. (2010). The Role of the Physiatrist in Life Care Planning. In R. O. Weed and D. E. Berens (eds.), *Life Care* | | IFN |
| *Planning and Case Management Handbook* (3rd ed., pp. 17-25). Boca Raton, FL: CRC Press. | | IFN |
| 6 Law CR, Dennis MJ, The Role of the Pediatric Physiatrist in Life Care Planning. In: Riddick-Grisham S, Deming LA. Pediatric Life | | IFN |
| Arias, E. (2019). United States Life Tables 2016. The National Vital Statistics Reports, Volume 68, Number 4. Retrieved from | | IFN |

| | http://www.cdc.gov/nchs/products/life_tables.htm | | |
|---|---|---|---|

Reservations:

     1.    The Plaintiffs reserve the right to introduce into evidence any exhibit identified by the Defendants.

     2.    The Plaintiffs reserve the right to introduce any literature cited by Plaintiffs' experts in their Reports.

     3.    This list of exhibits does not include documents or other material things that may be used for purposes of impeachment and rebuttal.

     4.    Plaintiffs and Plaintiffs' experts reserve the right to read into evidence and make reference to or identify medical, economic, and other literature and treatises in accordance with the Federal Rules of Evidence.

### B. **Defendants' Objections to Plaintiffs' Exhibits**

     1.    Defendant objects to the introduction into evidence of the following:

       a.    Incident/Accident Report – Joan Taylor – liability has already been established against Defendants.

       b.    Incident Report – Taylor Saunders – liability has already been established.

       c.    Joan Taylor Deposition, including Exs. 1 – 3 – liability already established.

       d.    Bradley Begelman Deposition, including Exs. 1 – 6 – liability established and duplicative of trial testimony.

       e.    Melvin Michael Derda, with all exhibits – liability established.

### C. **Defendants' Listing of Exhibits**

1.    All of K.W.'s medical, therapy, and school records (listed by Plaintiffs above).

2. Report of Stephen Nelson, M.D.

3. Report of Lisa Settles, Psy.D.

4. CV of Stephen Nelson, M.D.

5. CV of Lisa Settles, Psy.D.

6. Defendants reserve the right to use any of Plaintiffs' listed exhibits.

**D. <u>Plaintiffs' Objections to Defendants' Listing of Exhibits</u>**

1. None.

VII. **NON-EXPERT WITNESS LISTS**

**A. <u>Plaintiffs' Non-Expert Witness List</u>**

1. Plaintiff Katherine Gaylord-Wallisch, 613 Bianca Bay Street, Las Vegas, NV 89144

2. Plaintiff Aaron Wallisch, 613 Bianca Bay Street, Las Vegas, NV 89144

3. Plaintiffs reserve the right to call as a witness any witness identified or called by the Defendants.

**B. <u>Defendants' Non-Expert Witness List</u>**

1. Bradley Begelman or other corporate representative of Defendants

2. Defendants reserve the right to call as a witness any witness identified or call by the Plaintiffs.

VIII. **EXPERT WITNESS LISTS**

**A. <u>Plaintiffs' Expert Witness List</u>**

1. William A. Weiss, M.D., Ph.D., Neurologist

2. Andrea Bradford, M.Ed., CRC, Vocational Rehabilitation

3. Robert Cooper, M.D., FAAPMR, Life Care Planner and Rehabilitation Counselor

4. Ralph D. Scott, Jr., Ph.D., Economist

5.  Stacy J. Suskauer, M.D., Treating Neurologist

Plaintiffs' experts will testify in accord with the opinions given in their reports, depositions, affidavits, and/or hearing testimony.

### B.  <u>Defendants' Objections to Plaintiffs' Expert Witness List</u>

1.  None.

### C.  <u>Defendants' Expert Witness List</u>

1.  Stephen L. Nelson, M.D., Ph.D., Neurologist

2.  Lisa D. Settles, Psy.D., Neuropsychologist

Defendants' experts will testify in accord with the opinions given in their reports, depositions, affidavits, and/or hearing testimony.

### D.  <u>Plaintiffs' Objections to Defendants' Expert Witness List</u>

1.  None.

## IX.  DESIGNATED DEPOSITION TESTIMONY

### A.  <u>Plaintiffs' Designated Deposition Testimony</u>

Plaintiffs object, on relevance and prejudice grounds (given that liability has been established), to evidence or argument related to the issue of whether Defendants knew that the gap was not code-compliant, and will be filing a motion in limine to exclude it. If Plaintiffs' motion in limine is granted, Plaintiffs would not expect to use any designated deposition testimony. If the motion in limine is not granted, Plaintiffs reserve the right to utilize video clips of the Bradley Begelman, Joan Taylor, and/or Mike Derda depositions and to designate those segments at a later date.

<u>Plaintiffs' Reservations</u>:

1.  Plaintiffs reserve the right to add designations as described above.

2.      Plaintiffs reserve the right to read portions of the deposition testimony of any witness who may be unavailable to testify live at trial.

3.      To the extent that Defendants call any witness who has been deposed, Plaintiffs reserve the right to play the video, or read from that witness' deposition, while cross-examining said witnesses.

4.      Plaintiffs anticipate utilizing deposition transcripts and videotaped depositions at trial in accordance with the Federal Rules of Civil Procedure, during Plaintiffs' case in chief, for impeachment purposes, and for rebuttal.

**B.  <u>Defendants' Designated Deposition Testimony</u>**

None.

<u>Defendants' Reservations:</u>

1.      Defendants reserve the right to read portions of the deposition testimony of any witness who may be unavailable to testify live at trial.

2.      To the extent that Plaintiffs call any witness who has been deposed, Defendants reserve the right to play the video, or read from that witness' deposition, while cross-examining said witnesses.

3.      Defendants anticipate utilizing deposition transcripts and videotaped depositions at trial in accordance with the Federal Rules of Civil Procedure, during Plaintiffs' case in chief, for impeachment purposes, and for rebuttal.

**C.  <u>Defendants' Objections to Plaintiffs' Designated Deposition Testimony</u>**

None.

**D.  <u>Plaintiffs' Objections to Defendants' Designated Deposition Testimony</u>**

None.

## X.    OTHER PRETRIAL RELIEF

The parties will both be filing motions in limine simultaneously with this Joint Pretrial

Order.

### A.  <u>Plaintiffs' Additional Requested Pretrial Relief</u>

None needed.

### B.  <u>Defendants' Response to Plaintiffs' Additional Requested Pretrial Relief</u>

None.

### C.  <u>Defendants' Additional Requested Pretrial Relief</u>

None.

### D.  <u>Plaintiffs' Response to Defendants' Additional Requested Pretrial Relief</u>

None.

Dated: September 2, 2022                       /s/ Seth L. Cardeli
                                               Seth L. Cardeli
                                               slc@levinperconti.com
                                               LEVIN & PERCONTI
                                               325 North LaSalle Street, Suite 300
                                               Chicago, Illinois 60654

                                               Andrew S. Janet
                                               asjanet@jjsjustice.com
                                               JANET, JANET & SUGGS, LLC
                                               4 Reservoir Circle, Suite 200
                                               Baltimore, Maryland 21208
                                               Telephone: (410) 653-3200
                                               Fax: (410) 653-9030

                                               ATTORNEYS FOR PLAINTIFFS

                                               /s/Mary Malloy Dimaio
                                               Mary Malloy Dimaio, #06794
                                               Crosswhite, Limbrick & Sinclair, LLP
                                               25 Hooks Lane, Suite 314

Baltimore, MD  21208
410.653.6890
410.653.6896 (fax)
mmd@cls-law.com
*Attorneys for Defendants*